**Walter SANDERS, Petitioner–Appellant,**

**v.**

**James E. SULLIVAN and Robert Abrams, The Attorney General of the State of New York, Respondents–Appellees.**

No. 177, Docket 88–2079.

United States Court of Appeals, Second Circuit.

Argued Oct. 5, 1988.

Decided Dec. 2, 1988.

Alan J. Brudner, New York City (Henry Putzel III, New York City, of counsel), for petitioner-appellant.

Robert M. Raciti, Asst. Dist. Atty., New York City (Robert M. Morgenthau, Dist. Atty., Marc Frazier Scholl, Asst. Dist. Atty., New York City, of counsel) for respondents-appellees.

Before KAUFMAN, NEWMAN, and GARTH,* Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

In our system of government, the federal courts, Janus-like, must often observe two directions at once. On the one hand, through unstinting vigilance, we must warrant the guarantees of the Constitution. Yet we are enjoined, on the other hand, to forbear gratuitous intrusions into the judicial functions of the several states. Nowhere are these two competing imperatives

---

* The Honorable Leonard I. Garth, of the United States Court of Appeals for the Third Circuit, sitting by designation.

more inextricably intertwined than in a federal court's habeas corpus duties. By allowing state courts a fair opportunity to correct constitutional violations, a federal court fulfills its obligations both to the individual criminal defendant and to our system of federalism.

Petitioner Walter Sanders appeals from a judgment of the United States District Court for the Southern District of New York (Motley, J.) denying his petition for a writ of habeas corpus, 701 F.Supp. 1000 (S.D.N.Y.1988). Petitioner sought review of his New York state convictions for manslaughter in the second degree, robbery in the first and second degrees, and criminal possession of a weapon in the second and third degrees, arising from the shooting of Omar Sabir, a/k/a Bruce Thomas, during the robbery of a drug dealer, Carmelo Perez.

The events surrounding the murder of Omar Sabir were disputed at trial and remain in doubt today. Petitioner's conviction was predicated on the testimony of the state's two principal witnesses, Carmelo Perez, and his now deceased common-law wife, Irma Semiday. Both testified that Walter Sanders shot Sabir on October 14, 1980. Perez, however, recanted this testimony after his paramour died. After meeting Sanders at Sing–Sing prison, Perez revealed that he had perjured himself at trial to protect Semiday, who, he now asserts, shot and killed Sabir. It is upon this recantation and alleged perjury that Sanders bases this appeal.

In his district court petition, Sanders asserted four grounds of reversible error, including the prosecutor's knowing use of false testimony. Judge Motley held that state remedies had been exhausted. In the absence of state court fact finding on the perjury, and one other claim, she ordered an evidentiary hearing. After the hearing, Judge Motley denied the petition. She later issued a certificate of probable cause under Fed.R.App.P. 22(b), to consider whether "under the circumstances of this case, the appropriate standard for a violation of due process as a result of a recantation of a material witness does not require that the prosecutor be aware of the perjured trial testimony." For the reasons stated below, we affirm in part and remand.

## I

The origins of this proceeding derive from the sordid machinations of drug traffickers. Petitioner and his accomplice Sabir, supposedly interested in obtaining drugs, encountered Carmelo Perez, a Harlem drug dealer, in the hallway outside Perez's apartment. Sanders claims that he intended to buy drugs for a man he identified only as "Eric." Perez, in contrast, testified that petitioner and Sabir, each armed with guns, robbed him within a few feet of his door. According to Perez, during the holdup, Irma Semiday opened the apartment door to see what was happening in the hallway and was fired upon by Sabir and Sanders. When Semiday reopened the door, Perez claimed that Sanders fired again, accidentally shooting Sabir. Taking the stand in his own defense, Sanders testified he was unarmed and not robbing Perez on the night of the shooting. He stated that Irma Semiday shot and killed Sabir when she reopened the apartment door.

On April 19, 1982, a jury convicted Sanders of manslaughter in the second degree, robbery in the first and second degrees, and criminal possession of a weapon in the second and third degrees. On the manslaughter and robbery counts, he was sentenced to two five-to-fifteen year concurrent terms. He also received a two and one third-to-seven year concurrent term on the possession of a weapon count. After serving 6 years, he was paroled on August 3, 1988.

After his conviction, petitioner embarked on a series of appeals that led ultimately to this court. On direct appeal to the First Department of the Appellate Division of the Supreme Court of New York, petitioner claimed error in the court's discharge of a juror during the trial, prosecutorial misconduct, and an excessive sentence. The Appellate Division affirmed the conviction without opinion on January 31, 1984. *People v. Sanders*, 99 A.D.2d 686, 471 N.Y.

S.2d 727 (1984). The New York Court of Appeals denied Sanders's application for leave to appeal on May 16, 1984. *People v. Sanders,* 62 N.Y.2d 810, 477 N.Y.S.2d 1035, 465 N.E.2d 1278 (1984).

In April 1984, Sanders and Perez met at the Sing–Sing Correctional Facility, where both were incarcerated. Perez told the petitioner he knew that Irma Semiday, not Sanders, was guilty of shooting Sabir. Claiming remorse, Perez wanted the true facts to be known—since Irma Semiday was dead, he no longer felt the need to falsify on her behalf. Perez signed five typewritten affidavits, which Sanders produced in the prison library, recanting his trial testimony. Sanders then proceeded with a *coram nobis* motion to vacate his conviction, pursuant to N.Y.Crim.Proc.L. § 440.10 (McKinney 1983), alleging, *inter alia,* that the prosecution had knowingly used perjured testimony at trial. Because Sanders's papers, which included Perez's affidavit, contained no evidence that the prosecution had been aware of the alleged falsification, Justice Rothwax denied the motion without an evidentiary hearing in March, 1985. Leave to appeal further was denied.

Sanders then sought, *pro se,* a writ of habeas corpus. He requested a new trial because of 1) prosecutorial misconduct in making negative statements about a defense witness, 2) the trial court's improper discharge of the jury foreperson, 3) ineffective assistance of counsel, and 4) the prosecutor's knowing use of perjured testimony. After finding that Sanders had exhausted his remedies, Judge Motley granted an evidentiary hearing on Sanders's latter two claims because no facts were "found" in state court. At this hearing, Perez recanted part of his testimony and stated that Irma Semiday had shot Sabir. He maintained, however, that Sanders was armed and had attempted to rob him at the time of the shooting.

Sanders initially claimed in his petition that the Assistant District Attorney knew that Perez perjured himself at trial. But after the hearing he conceded the total lack of evidence on this point. Indeed, Perez testified at the hearing that he had never informed the Assistant District Attorney of the falsehoods in his previous testimony. Because Judge Motley found that petitioner had failed to demonstrate prosecutorial knowledge of the alleged perjury, she considered it unnecessary to determine the credibility of Perez's recantation. While she was aware of his claim regarding the use of perjured testimony alone, she considered it legally meritless. Judge Motley also denied the other grounds of the petition.

Sanders sought a certificate of probable cause to permit appeal of the denial of the writ, arguing that his conviction, based only upon Perez's alleged perjury, denied due process of law to him. He had pressed this claim after the evidentiary hearing in his Proposed Findings of Fact and Conclusions of Law. Judge Motley granted the certificate pursuant to Fed.R.App.Pro. 22(b) to determine whether due process rights are violated when a conviction rests on perjured testimony although there is no prosecutorial complicity or knowledge of the perjury. In granting the certification, Judge Motley noted that we had not directly confronted this issue.

II

Designed to provide expeditious relief for those imprisoned in violation of the Constitution, the federal habeas corpus statute, 28 U.S.C. § 2254 (1982), embodies one of the jewels of American common law and our federal system of governance. It generally requires a state prisoner seeking federal review of a conviction to exhaust available state remedies. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). The essence of this doctrine is that state courts, as well as federal courts, are guardians of the federal constitutional rights of state criminal defendants. *Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982); *Irvin v. Dowd,* 359 U.S. 394, 404–05, 79 S.Ct. 825, 831–32, 3 L.Ed.2d 900 (1959); *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (in banc). The requirement of exhaustion is an expression

of comity within our federal system; "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation...." *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950). Only a fair presentation of the factual and legal premises of the federal claim to the state courts satisfies the exhaustion requirement. *Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); *Picard v. Connor*, 404 U.S. at 276–77, 92 S.Ct. at 512–13.

Like most general rules, the rule requiring exhaustion is not iron-clad—a court of appeals may, in some circumstances, review a petitioner's claim despite the lack of exhaustion in the state courts if the State failed to argue lack of exhaustion in the district court. See *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987). In that case, the Supreme Court adopted a flexible case by case approach to determine whether or not a nonexhausted petition should be remanded to state court. Emphasizing the delicate calculus that underlies the exhaustion doctrine, the Court declined to adopt a rigid formulation, considering but rejecting rules that would either treat the State's silence as a procedural bar on appeal or require dismissal of any nonexhausted petition. *Granberry*, 107 S.Ct. at 1673–74. Rather, the Court instructed us to determine whether the interests of federalism, comity, and the administration of justice are best served by a remand or a decision on the merits. *Id.* at 1674–75.

In the instant case, New York argues that the claim Judge Motley certified is not exhausted because in state and district court, Sanders merely alleged the prosecutor's knowing use of false testimony, not use of perjured testimony *vel non*. According to the State, only in federal court, after he realized that his claim of knowing prosecutorial use of perjured testimony would fail because Perez denied informing the Assistant District Attorney that his testimony was false, did Sanders urge the claim now before us.

Petitioner counters by asserting that, under the law of this circuit, the two claims satisfy the exhaustion requirement because they are "substantially similar." *See Daye v. Attorney General*, 696 F.2d at 192. This doctrine requires that the legal claims petitioner presses in the federal court partake of the same essence as the claim presented in the state court. *Id.*

In our view, the claim of knowing prosecutorial use of perjured testimony is not substantially the same as the assertion that allegedly perjured testimony, standing alone, is a violation of an accused's due process rights. While Sanders's claim before the state courts contained elements of his claim as it appears on appeal, it could properly have been understood by the state court to be raising only a constitutional claim of knowing use of perjured testimony. Sanders's shift in the claim presented to the district court is not a mere permutation or refinement of a more general legal theory as was the case in *Matusiak v. Kelly*, 786 F.2d 536, 541–43 (2d Cir.), *cert. dismissed*, 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986). The court's finding in *Matusiak*, that the claims presented on appeal were "the same substantive arguments" as had been presented in the New York Appellate Division finds no support in the instant case. *Id.* at 542.

■ Despite the absence of exhaustion, we do not think this case must be remanded to the New York Supreme Court. While at the outset of his habeas proceeding Sanders did not claim that use of perjured testimony alone violated the Constitution, he did raise this argument in his Proposed Findings of Fact and Conclusions of Law. The State, however, did not assert lack of exhaustion as a defense to the false testimony claim in its Brief in Reply to Petitioner's Proposed Findings of Fact and Conclusions of Law. Though a petitioner should normally alert the State to all constitutional claims in the habeas petition itself, *Granberry v. Greer, supra*, affords us discretion in considering the State's failure to assert lack of exhaustion as a waiver in the circumstances of this case. Applying *Granberry*, we conclude that a remand to

the state courts is not required. Judge Motley has already conducted a hearing and heard Perez's testimony. In addition, it is unclear that Perez is available to testify in state court. To speed the administration of justice and conserve judicial resources, we believe it to be appropriate for Judge Motley to finish the inquiry she began. *See United States ex rel Sostre v. Festa*, 513 F.2d 1313, 1314 n. 1 (2d Cir.), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975). We therefore remand this case to the district court.[1]

## III

In the district court, Sanders argued that a due process violation occurs if a state leaves a conviction in place after a credible recantation of material testimony. As Judge Motley correctly recognized, "a habeas petitioner seeking relief on the ground of a recantation of allegedly perjured testimony" establishes a due process violation by showing that the prosecutor knowingly used perjured testimony. *See, e.g., Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) (prosecutor's knowing use of false testimony "incompatible with 'rudimentary demands of justice'") (quoting *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935)). In her view however, perjured testimony, without more, does not rise to the level of a constitutional defect.

We are mindful that the rule in many jurisdictions supports Judge Motley. *See, e.g., United States ex rel. Burnett v. Illinois*, 619 F.2d 668, 674 (7th Cir.) ("The introduction of perjured testimony without more does not violate the constitutional rights of the accused."), *cert. denied*, 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104

(1980); *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir.) (due process violation requires "a showing of prosecutorial involvement in the perjury"), *cert. denied*, 423 U.S. 937, 96 S.Ct. 297, 46 L.Ed.2d 270 (1975).[2] Although many of these cases adopt this rule with little or no analysis, the doctrine is based on the view that only prosecutorial, or at least official governmental involvement constitutes the requisite state action necessary to a due process violation, and on a concern for the maintenance of finality in criminal proceedings. We note that to the extent these cases disapprove the principle that a due process violation occurs when, without more, perjured testimony is introduced at trial, we would concur.

In our view however, it is indeed another matter when a credible recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in place.[3] *Cf. United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985) ("[C]onstitutional error occurs ... only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."); *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). In this case, we believe that allowing the conviction to stand violates due process. *See generally* Note, *I Cannot Tell A Lie: The Standard for New Trial in False Testimony Cases*, 83 Mich.L.Rev. 1925 (1985); Carlson, *False or Suppressed Evidence: Why a Need for the Prosecutorial Tie?*, 1969 Duke L.J. 1171.

This circuit is no stranger to this rule. In *Kyle v. United States*, 266 F.2d 670 (2d Cir.), *cert. denied*, 361 U.S. 870, 80 S.Ct. 131, 4 L.Ed.2d 109 (1959), the petitioner

---

1. In determining the credibility of Perez's recantation, we leave to Judge Motley's discretion the question of whether the record is sufficient as it stands, or whether it must be reopened.

2. *See also Smith v. Wainwright*, 741 F.2d 1248, 1257 (11th Cir.1984); *United States v. Jones*, 614 F.2d 80, 82 (5th Cir.1980); *Smith v. United States*, 358 F.2d 683 (3d Cir.1966); *Marcella v. United States*, 344 F.2d 876 (9th Cir.1965); *Wild v. Oklahoma*, 187 F.2d 409, 410 (10th Cir.1951).

3. Though the petitioner did not exhaust his claim based on the recantation alone in state court because he failed to present it as a federal constitutional contention, for purposes of satisfying the state action requirement, he sufficiently alerted the state court to the recantation. The state court, nevertheless, left the conviction in place. Exhaustion is a separate matter, which would have required a remand to the state courts for consideration of the federal claim, had the State properly asserted this defense.

alleged that his conviction for mail fraud was based in part on the perjured testimony of a postal inspector. While affirming a lower court finding that no false testimony occurred, the panel accepted the argument that use of perjured testimony alone violates due process. *Id.* at 672. Indeed, the court cited cases from the Third and Fifth circuits as precedent for this rule. One illustration, *Smith v. United States,* 223 F.2d 750 (5th Cir.1955), involved allegations that a government agent testified falsely at the sentencing hearing subsequent to Smith's conviction for kidnapping. The court held that "if [the] Agent ... did in fact give false information as alleged to the district court [regarding the petitioner's prior convictions], then the defendant's sentence would be lacking in due process...." *Id.* at 754. In *Curran v. Delaware,* 259 F.2d 707 (3rd Cir.1958), *cert. denied,* 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959), the court held that although the prosecution had no knowledge of the perjury by a local police detective, that testimony's potential prejudicial effect on the jury "cause[d] the defendant's trial to pass the line of tolerable imperfection and fall into the field of fundamental unfairness." *Id.* at 713.

More recently, in *United States ex rel. Sostre v. Festa,* 513 F.2d 1313 (2d Cir.), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975), involving an appeal of a denial of a writ of habeas corpus, we entertained a claim of perjured testimony without the prosecutor's knowledge by an informant for the Buffalo, New York Police Department. We did not answer the question of whether it was necessary to show prosecutorial knowledge of the perjury. In a concurring opinion, Judge Feinberg remarked, "a claim that the conviction was based on perjurious testimony goes to the very heart of the criminal process, which, to be effective, must ultimately rest upon the confidence of the citizenry that it is fair and thorough." *Id.* at 1320. As he stated the case, "the issue before the federal dis-

trict court was whether Sostre had been denied due process because of the alleged perjury of Williams [the informant]." *Sostre,* 513 F.2d at 1321. While the court appeared to accept the underlying legal theory, it did not offer any analysis because it held, as in *Kyle,* that the alleged recantation was not credible. *Sostre,* 513 F.2d at 1319.

While Sanders relies heavily upon this case, it is far from the only authority supporting this view. *Durley v. Mayo,* 351 U.S. 277, 76 S.Ct. 806, 100 L.Ed. 1178 (1956), involved a habeas petition alleging that Durley's conviction for stealing cattle was based upon perjurious testimony. While Justice Burton's majority opinion dismissed the claim as barred by res judicata, an adequate state ground, a dissent by Justice Douglas would have reached the merits. Joined by Chief Justice Warren and Justices Black and Clark, Justice Douglas stated:

> It is well settled that to obtain a conviction by the use of testimony known to the prosecution to be perjured offends due process. *Mooney v. Holohan,* 294 U.S. 103 [55 S.Ct. 340]; *Pyle v. Kansas,* 317 U.S. 213 [63 S.Ct. 177, 87 L.Ed. 214 (1942) ]. While the petition did not allege that the prosecution knew that the petitioner's codefendants were lying when they implicated petitioner, the State now knows that the testimony of the only witnesses against petitioner was false. No competent evidence remains to support the conviction. Deprivation of a hearing under these circumstances amounts in my opinion to a denial of due process of law.

*Id.* at 290–91, 76 S.Ct. at 814.[4]

Cases from other circuits support this rule as well. The leading case, *Jones v. Kentucky,* 97 F.2d 335 (6th Cir.1938), involved a habeas petition which alleged that Jones, a convicted murderer awaiting execution, was adjudged guilty on the basis of

---

**4.** Contrary dicta appears in an earlier case, *Hysler v. Florida,* 315 U.S. 411, 413, 62 S.Ct. 688, 690, 86 L.Ed. 932 (1942) (Petitioner "cannot, of course, contend that mere recantation of testi-

mony is in itself ground for invoking the Due Process Clause against a conviction.") (Frankfurter, J.).

false testimony. The court cogently argued:

"[T]he fundamental conceptions of justice which lie at the base of our civil and political institutions" must with equal abhorrence condemn as a travesty a conviction upon perjured testimony if later, but fortunately not too late, its falseness is discovered....

*Id.* at 338 (quoting *Mooney v. Holohan*, 294 U.S. at 111, 55 S.Ct. at 341). The *Jones* Court viewed its holding as the logical extension of the principle enunciated by the Supreme Court in *Mooney*. Referring to *Mooney*, the court stated, "[T]he state in the [false testimony alone] case as in the other [knowing prosecutorial use case] is required to afford a corrective judicial process to remedy the alleged wrong, if constitutional rights are not to be impaired." *Id.* Yet criticism of this case stems, at least in significant part, from the view that *Mooney* established the outer limits of due process protection.

Thirteen years ago, a divided Sixth Circuit panel questioned the broad applicability of the *Jones v. Kentucky* doctrine, and ultimately limited the case to its facts. *Burks v. Egeler*, 512 F.2d 221 (6th Cir. 1975). While engaging in a less detailed analysis, similar rulings regarding the effect of this case have issued in the Seventh and District of Columbia circuits. *See United States ex rel. Williams v. Walker*, 535 F.2d 383, 386–87 (7th Cir.1976); *Hodge v. Huff*, 140 F.2d 686, 688 (D.C.Cir.), *cert. denied*, 322 U.S. 733, 64 S.Ct. 946, 88 L.Ed. 1567 (1944). It is the *Burks* case that offers the most searching and representative critique of *Jones*. It also offers a paradigmatic discussion of the often unspoken rationale that underlies the cases rejecting the view that a conviction based on perjured testimony alone offends due process of law.

As articulated in *Burks*, this rationale rests primarily on the view that "[t]he distinction between that which constitutes state action under [*Mooney v.*] *Holohan* and that which does not ... still has validity as marking the borderline of federal constitutional involvement." *Burks*, 512

F.2d at 225. Essentially, these cases explicitly, and sometimes implicitly, assert that state action, as defined by active government acts—generally knowing prosecutorial use of perjury—triggers a due process violation. Unlike the *Jones* doctrine, this rationale focuses on the nature of the action and the identity of the witness, rather than on the effect of the testimony itself on the trier of fact. As the *Burks* court summarized, "it was government action and responsibility which lay at the heart of the violation." *Id.*

In our view, this criticism is unpersuasive. There is no logical reason to limit a due process violation to state action defined as prosecutorial knowledge of perjured testimony or even false testimony by witnesses with some affiliation with a government agency. Such a rule elevates form over substance. It has long been axiomatic that due process requires us "to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). It is simply intolerable in our view that under no circumstance will due process be violated if a state allows an innocent person to remain incarcerated on the basis of lies. A due process violation must of course have a state action component. We believe that Justice Douglas accurately articulated the appropriate definition that accords with the dictates of due process: a state's failure to act to cure a conviction founded on a credible recantation by an important and principal witness, exhibits sufficient state action to constitute a due process violation. *See Durley v. Mayo*, 351 U.S. 277, 290–91, 76 S.Ct. 806, 813–14, 100 L.Ed. 1178 (1956).

The second element of the rationale is finality. Courts have often expressed a concern that permitting a due process violation for use of perjured testimony alone will give rise to limitless collateral attacks on criminal convictions. Permitting this doctrine would subject "every criminal conviction other than a plea of guilty ... to repetitive retrial on post-conviction petitions long after the criminal trial had occurred and long after time had erased both memories and witnesses, for few persons

convicted of crime do not contend that something untrue was said in their trial." *Burks*, 512 F.2d at 229 (quoting *Hoffa v. United States*, 339 F.Supp. 388, 393 (E.D. Tenn.1972)).

■ We think that fear of a loss of finality, though legitimate and carrying weight, is unfounded here. As we noted in *Sostre*, "traditionally the recantation of testimony given on trial is 'looked upon with the utmost suspicion.'" *Sostre*, 513 F.2d at 1318 (quoting *United States v. Troche*, 213 F.2d 401, 403 (2d Cir.1954) (quoting *Harrison v. United States*, 7 F.2d 259, 262 (2d Cir.1925))). Such careful scrutiny will continue to be the norm. Of greater importance, as we briefly noted earlier, we do not believe that due process demands a hearing to determine the credibility of every recantation of testimony. Only recantations of material testimony that would most likely affect the verdict rise to the level of a due process violation, if a state, alerted to the recantation, leaves the conviction in place. This standard of scrutiny meets at least some of the criticism made by many of the cases rejecting this view. *See, e.g., Luna v. Beto*, 395 F.2d 35, 41 (5th Cir.1968) ("What elevates the [evidentiary] 'mistake' to a constitutional plane is . . . . [that] the mistake must be material in the sense of a crucial, critical, highly significant factor.") (in banc) (Brown, C.J., concurring), *cert. denied*, 394 U.S. 966, 89 S.Ct. 1310, 22 L.Ed.2d 568 (1969).

### IV

We are not alone in believing that our holding today is in step with the spirit of the Constitution. Academic commentary has long supported our position. Nearly twenty years ago, one observer concluded:

The established standard of certain courts, to the effect that a conviction based on false evidence is unassailable unless the defendant can prove a knowing use by the prosecution, appears inadvisable. Judicial concern in these cases should concentrate on vouchsafing the right of a fair trial to the convicted person. Hedged with the appropriate standards requiring the defendant to demonstrate materiality of the tainted evidence, the more liberal approach advocated here would threaten only those final judgments which merit unsettlement.

Carlson, *False or Suppressed Evidence: Why a Need for the Prosecutorial Tie?*, 1969 Duke L.J. 1171, 1187–88 (footnote omitted). *See also* Note, *I Cannot Tell A Lie: The Standard for New Trial in False Testimony Cases*, 83 Mich.L.Rev. 1925, 1934 & n. 33 (1985). While we are convinced this principle is fair and right, we are equally concerned that it be "hedged with the appropriate standards." Therefore, we now turn to the requisite level of materiality necessary to violate due process.

Under Rule 33 of the Federal Rules of Criminal Procedure,[5] we have often considered when new evidence warrants a new trial. Such motions "are granted only with great caution . . . in *the most extraordinary circumstances.*" *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir.1987) (citations omitted). Along with most circuits, we adhere to the standard enunciated over a century ago in *Berry v. State of Georgia*, 10 Ga. 511 (1851), which demands new evidence be so material that it would "probably" cause a result of acquittal upon retrial. With regard to cases alleging the use of perjurious testimony, we have applied the less stringent test of *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928), which would grant a new trial if the court determines that the new evidence "might" alter the verdict of the jury. Since 1975, however, we have limited the application of *Larrison* to cases alleging the prosecutor's knowing use of false testimony. *United States v. Stofsky*, 527 F.2d 237, 245–46 (2d Cir.1975).[6]

---

5. In relevant part, Rule 33 states, "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." Fed.R.Crim.P. 33.

6. Although presented with this question, the Supreme Court declined to pass on it because the Court determined that the district court's finding was not reviewable. *United States v. Johnson*, 327 U.S. 106, 111 n. 5, 66 S.Ct. 464, 466 n. 5,

This modification to the *Berry* standard represented the culmination of growing disenchantment with the consequences of the more liberal *Larrison* test in cases of perjured testimony alone. *Stofsky*, 527 F.2d at 245 (citing *United States v. Marquez*, 363 F.Supp. 802, 806 (S.D.N.Y.1973) (Weinfeld, J.), *aff'd on opinion below*, 490 F.2d 1383 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974); *United States v. DeSapio*, 435 F.2d 272, 286 n. 14 (2d Cir.1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971)). Our concerns in that case are equally appropriate here. Our shift stemmed from a belief that the more flexible standard would require reversal when the perjury went only to an immaterial aspect of the proof. We stated:

> [I]f literally applied, ... [the *Larrison* test w]ould require reversal in cases of perjury with respect to even minor matters, especially in light of the standard jury instruction that upon finding that a witness had deliberately proffered false testimony in part, the jury may disregard his entire testimony. Thus, once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, "might" have acquitted.

*Stofsky*, 527 F.2d at 245–46. Adoption of the probability standard was designed to reverse fewer cases. Also, unlike *Larrison*, *Stofsky* appropriately allows the reviewing court to consider the effect of the perjury on the credibility of the witness in addition to the government's case. *Id.* at 246.

After *Stofsky*, the test for granting a new trial incorporated other elements of

the *Larrison* standard into the *Berry* probability standard. In *United States v. DiPaolo*, 835 F.2d 46 (2d Cir.1987), we noted the standard required that: 1) the recanted testimony be false and material, 2) the jury probably would have acquitted the defendant, and 3) the movant be surprised by the false testimony or be unaware of its falsity until after the trial, and be unable to discover it with due diligence. *Id.* at 49. In synthesizing the rule in this manner, the panel in *DiPaolo* relied upon our prior holdings in *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980), *Stofsky, supra, Sostre, supra*, and *United States ex rel. Rice v. Vincent*, 491 F.2d 1326 (2d Cir.), *cert. denied*, 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974). The *DiPaolo* court did not explicitly note the change wrought by our *Stofsky* decision. In stating the rule to apply in cases of recanted testimony, the court, without explanation or discussion, merged the "surprise" prong of *Larrison* with the "due diligence" requirement usually associated with *Berry*. When we rejected the *Larrison* test in *Stofsky*, we did not impose a separate surprise requirement. In view of the due process concerns at stake, we are satisfied that the surprise requirement plays no role in cases such as this.[7]

## V

We add, finally, it is our belief that the perjured testimony which will trigger a due process violation must be of an extraordinary nature. It must leave the court with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.[8]

---

90 L.Ed. 562 (1946) ("[W]e also need not consider what criteria should have guided the court in passing on the motion, had respondents actually shown that Goldstein recanted his testimony or that he committed perjury. Compare *Larrison v. United States* ... with *Berry v. Georgia*....").

**7.** Some argue that the surprise and due diligence requirements are two sides of the same coin, *see* Note, *I Cannot Tell A Lie: The Standard for New Trial in False Testimony Cases*, 83 Mich.L.Rev. 1925, 1928 n. 11 (1985). While we believe these tests share an underlying rationale —ensuring that all information is as fully presented as possible at trial—they are qualita-

tively different in application. Due diligence sets forth the defense attorney's reasonable obligation to both court and client. Surprise, however, reaches into matters beyond counsel's control.

**8.** The State has invited us to deny Sanders's petition on two alternative grounds: (1) that the "concurrent sentence" doctrine would permit us to deny the relief; and (2) that inasmuch as the recantation implicated only Sabir's death, it should not affect Sanders's conviction for robbery and criminal possession of a weapon. In light of our due process discussion, the five factors regarding the concurrent sentence doc-

Accordingly, we remand to the district court for determination of the credibility of Perez's recantation. If Judge Motley finds that Perez did perjure himself at trial, the court should act in accordance with the standards we have set forth.

trine identified in *United States v. Vargas*, 615 F.2d 952, 956–60 (2d Cir.1980), and our inability to determine the effect on the jury of Perez's

recantation if found to be credible, we decline the State's invitation.